FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND
2017 MAR -2 P 3:07
CLERK'S OFFICE
AT GREENBELT
BY____

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
***Southern Division***

**J.F. and D.F. *ex rel.* CRAIG and DEBORAH ANN BENTON,**

**Plaintiffs,**

**v.** **Case No.: GJH-16-2177**

**CORRECT CARE SOLUTIONS, LLC *et al.*,**

**Defendants.**

* * * * * * * * * * * * *

## MEMORANDUM OPINION

This case arises out of the death of Melissa Mae Benton ("Ms. Benton"), a 36-year-old woman, while she was in the custody of the St. Mary's County Detention Center (the "Detention Center"). Ms. Benton's minor children, J.F. and D.F., by their guardians and next friends Craig and Deborah Ann Benton, and Ms. Benton's adult daughter, Brittany Fleshman, bring suit against Correct Care Solutions, LLC ("CCS"), Conmed Health Care Management, Inc. ("Conmed"), and individual health care staff[1] (collectively, "Health Care Provider Defendants"), as well as individual correctional staff[2] (collectively, "Correctional Defendants") at the Detention

[1] In addition to CCS and Conmed, Plaintiffs bring suit against 12 individual health care staff members: Dr. Vabian Lewitt Paden, Certified Nursing Assistant ("CNA")/Certified Medication Technician ("CMT") James Cawley, Registered Nurse ("R.N.") Melissa Henderson, Physician's Assistant ("P.A.") Nancy Sidorowicz, CNA Penny King, CNA Ashley Sampson, CNA Kristy Randolph, CNA Latoya Beaumont, CNA Brandon Hosselrode, CNA Tara King, Licensed Clinical Social Worker ("LCSW") Lisa Winkler, and R.N. Melissa Perdue, (individuals collectively are "Individual Health Care Provider Defendants;" together with CCS and Conmed they are "Health Care Provider Defendants.").

[2] Plaintiffs also bring suit against 14 correctional staff members: Corporal Gretchen Irby, Officer Monica Thomas, Officer Jason Smith, Officer Jane Thompson, Officer Sebije Boyd, Officer Michael Labanowski, Jr., Officer Catherine Poole, Officer Benjamin Luffey, Corporal Daniel Catlett, Officer Maurice Gogul, CFC Sherry Harrison, Inmate Services Coordinator Casey Long, Sgt. Bruce Raley, and Sgt. Anthony Fenwick, (collectively "Correctional Defendants").

Center, alleging claims under 42 U.S.C. § 1983 and Maryland state law. Presently pending before the Court is a Motion to Dismiss by Individual Defendants P. King, Hosselrode, T. King, Randolph, Beaumont, and Winkler, ECF No. 14, and a separate Motion to Dismiss by Individual Defendant Cawley, ECF No. 21. No hearing is necessary. *See* Loc. R. 105.6. For the following reasons, Defendants' Motions to Dismiss are granted, in part, and denied, in part.

## I. BACKGROUND

Melissa Mae Benton entered the St. Mary's Detention Center on October 8, 2013 to await transfer to the Maryland Department of Corrections to begin serving a seven year sentence. ECF No. 4 ¶ 46. At the time, Ms. Benton was 36 years old and suffered from various drug addictions, bipolar disorder, unexplained weight loss, and a host of health issues. *Id.* ¶ 45. When Ms. Benton arrived at the Detention Center, Certified Nursing Assistant ("CNA") Penny King conducted an intake examination.[3] ECF No. 4 ¶ 48. Ms. King noted that Ms. Benton suffered from high blood pressure, bipolar disorder, unexplained weight loss, an enlarged colon, and drug addiction. *Id.* Ms. King further noted that Ms. Benton was supposed to receive follow-up medical care for her enlarged colon. *Id.* Ms. King also reported that Ms. Benton was an intravenous drug user and had taken unprescribed Oxycodone the previous day. *Id.* Ms. King's report stated that Ms. Benton "will be placed on Benzo protocol[4] per Conmed." *Id.*

On or about October 9, 2013, Ms. Benton underwent a second health assessment by members of the medical staff, a Suicide Prevention Screening by Defendant Licensed Clinical Social Worker ("LCSW") Winkler, and an interview by the inmate services coordinator. ECF

---

[3] While she was in custody, Ms. Benton received care from individuals employed by Defendants Correct Care Solutions ("CCS") and Conmed Health Management, Inc. ("Conmed"). According to the Amended Complaint, CCS is a Kansas limited liability company that provides health care to inmates through Conmed, a Maryland corporation. ECF No. 4 at 7. At all times relevant to the action, CCS and Conmed had contracts to employ health care providers and provide health care services to inmates at the Detention Center. *Id.*

[4] In this context, this protocol refers to a method of withdrawal management for users of benzodiazepines. National Center for Biotechnology Information, *Withdrawal Management*, https://www.ncbi.nlm.nih.gov/books/NBK310652/ (last visited February 21, 2017).

No. 4 at 16. The health assessment noted that Ms. Benton had a long history of addiction to heroin, Xanax, and Oxycodone and was currently experiencing opioid withdrawal. *Id.* ¶¶ 49, 51. Physician's Orders signed at the time stated that staff were to "notify clinician if possible deterioration occurs such as unstable blood pressure . . . persistent vomiting, or dehydration." *Id.* ¶ 51. Following the Suicide Prevention Screening, LCSW Winkler did not recommend immediate action for Ms. Benton, but scheduled her for a further mental health assessment for the week of October 14, 2013.

As part of Ms. Benton's detox protocol, she was prescribed Librium, Phenergan, Clonidine, vitamins, and Imodium.[5] ECF No. 4 ¶ 53. Despite these instructions, however, the Amended Complaint identifies a number of instances in which Ms. Benton received sporadic doses of these medications, or none at all. *Id.* ¶ 54, 55, 57, 67. For example, Ms. Benton was to receive 4 mg of Imodium three times a day for her abdominal cramps, yet no Imodium was administered. *Id.* ¶ 55. Phenergan was allegedly withheld for two days. *Id.* ¶ 57. Clonidine was administered only once. *Id.* ¶ 54. Ms. Benton informed medical staff of her stomach pains, but her complaints were dismissed without examination. *Id.* ¶¶ 55, 58.

By October 11, 2013, Ms. Benton began experiencing severe symptoms, including repeat vomiting and tremors. ECF No. 4 ¶ 56. Her blood pressure had elevated to 153/106. *Id.* ¶ 57. Although Ms. Benton was supposed to receive 0.1 mg of Clonidine to treat the high blood pressure, that order was not carried out. *Id.* ¶ 57. Ms. Benton refused all of her meals on October 12 and 13, 2013. *Id.* ¶ 58. She also complained of chest pain and suffered from diarrhea. *Id.* ¶ 59. Her pulse was 48 beats per minute and her oxygen saturation was 90%, indicating an abnormally low level. *Id.* Despite Ms. Benton's condition, the health and correctional staff simply told her

---

[5] According to the Complaint, Librium is used to treat anxiety and acute withdrawal; Phernergan is used to treat nausea and vomiting, Clonidine is used to treat high blood pressure; Imodium is used to treat diarrhea. ECF No. 4 ¶ 53.

"to relax," and gave her some "Gatorade to hydrate." *Id.* Under the Physician's Order from October 9th, if Ms. Benton's oxygen saturation level fell below 92%, care providers were instructed to call 911. *Id.* ¶ 51. But no one did.

A number of Detention Center health care providers and correctional officers conducted numerous cell checks on Ms. Benton over the course of two days, and witnessed her "vomiting profusely, having abdominal cramps, complaining of chest pains, and refusing all meals." *See* ECF No. 4 ¶¶ 60–62, 64–69. However, none of them took any measures to ensure that Ms. Benton received additional medical care or intervention. *Id.* On October 12, 2013, Defendant CNA Beaumont checked Ms. Benton's vital signs and noted that Ms. Benton's pulse was a "dangerously low" 36 beats per minute. *Id.* ¶ 62; ECF No. 4-4 at 13, 17.[6] Ms. Benton asked if she could go to the hospital, but her request was denied as "not indicated." *Id.* ¶ 63. On October 12, CNA/CMT Cawley and CNA Hosselrode both administered medication to Ms. Benton "at least twice" and witnessed her "vomiting profusely, having abdominal cramps, and refusing all meals," but failed to call for medical help. *Id.* ¶¶ 65–66.

On the morning of October 13, 2013, Defendant Cawley entered Ms. Benton's cell to deliver her medication. ECF No. 4 ¶ 71. Mr. Cawley stated that Ms. Benton "did not seem to see him" and was in "an altered mental status." *Id.* She reached out and crushed the cups he was attempting to hand her. *Id.* Ms. Benton finally took the medication, then grabbed her mattress and began rocking back and forth. *Id.* Mr. Cawley allegedly made no efforts to obtain medical attention for Ms. Benton, but rather, issued a memorandum "that Ms. Benton not be allowed out of her cell, except for her shower, because she was unsteady on her feet." *Id.* By October 13, Ms.

---

[6] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

Benton's blood pressure had reached 163/109 and her heart rate was 106 beats per minute. *Id.* ¶ 73.

On October 13, 2013 at approximately 5:55PM, Ms. Benton was found non-responsive in her cell. ECF No. 4 ¶ 79. She was not breathing and had no pulse. *Id.* Ms. Benton was transported to St. Mary's Hospital a half hour later, where she was pronounced dead. *Id.* The autopsy report concluded that Ms. Benton "died of cardiac arrhythmia due to myocardial fibrosis and hypertensive heart disease. Chronic drug and alcohol abuse were contributing causes of death." ECF No. 4-4 at 16.

Melissa Mae Benton's minor children, J.F. and D.F., bring this action by their guardians and next friends, Craig and Deborah Benton, Melissa's parents. Also named as a Plaintiff is Brittany Fleshman, Melissa's adult daughter. The Plaintiffs assert claims for: I) negligence, II) Eighth and/or Fourteenth Amendment violations under 42 U.S.C. § 1983, and III) wrongful death against the Health Care Provider Defendants, as well as IV) Eighth and/or Fourteenth Amendment violations under 42 U.S.C. § 1983, V) gross negligence, and VI) wrongful death against the Correctional Defendants. ECF No. 4. Accompanying Plaintiffs' Complaint is Plaintiffs' waiver of arbitration before the Maryland Health Care Alternative Dispute Resolution Office, ECF No. 4-3, an Order of Transfer from the Maryland Health Care Alternative Dispute Resolution Office to this Court, ECF No. 4-5, and a Certificate of Qualified Expert and Report from Dr. Robert L. Cohen, ECF No. 4-4.

Individual Defendants P. King, Hosselrode, T. King, Randolph, Beaumont, and Winkler filed a Motion to Dismiss Plaintiffs' Amended Complaint, ECF No. 14. Individual Defendant James Cawley filed a separate Motion to Dismiss Plaintiffs' Amended Complaint, ECF No. 21. All other Defendants have filed an Answer to the Amended Complaint. ECF Nos. 15, 16, and 32.

Plaintiffs filed a Consolidated Response in Opposition on August 26, 2016. ECF No. 22. Defendants filed their Reply on September 12, 2016. ECF No. 23. Defendants request that the Court dismiss Counts II and III against P. King, Hosselrode, T. King, Randolph, Cawley, and Beaumont,[7] and dismiss all counts against Lisa Winkler. The Motions to Dismiss are now ready for review.

## II. STANDARD OF REVIEW

Defendants may "test the adequacy of a complaint by way of a motion to dismiss under Rule 12(b)(6)." *Prelich v. Med. Res., Inc.*, 813 F. Supp. 2d 654, 660 (D. Md. 2011) (citing *German v. Fox,* 267 F. App'x 231, 233 (4th Cir. 2008)). Motions to dismiss for failure to state a claim do "not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Prelich*, 813 F. Supp. 2d at 660 (citing *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999). To overcome a Rule 12(b)(6) motion, a complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when "the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In evaluating the sufficiency of the Plaintiffs' claims, the Court accepts factual allegations in the complaint as true and construes the factual allegations in the light most favorable to the Plaintiff. *See Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005). However, the complaint must contain more than "legal conclusions, elements of a cause of action, and bare assertions devoid

[7] These Defendants originally asked the Court to dismiss all counts against them. ECF No. 14; ECF No. 21. However, in their Reply, ECF No. 23, Defendants "concede[d] that Plaintiffs were not required to submit claims against the CNA/CMT Defendants to the Health Claims Alternative Dispute Resolution Office," as relevant to the survival action/negligence claim in Count I. Therefore, the analysis here addresses only the § 1983 claim and wrongful death claim (Counts II and III) as to Defendants P. King, Hosselrode, T. King, Randolph, Cawley, and Beaumont.

of further factual enhancement." *Nemet Chevrolet, Ltd v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The court should not affirm a motion to dismiss for failure to state a claim for relief unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 548 (4th Cir. 2001) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50).

## III. ANALYSIS

### A. Constitutional Claims

In Count II of the Complaint, Plaintiffs assert violations of the Eighth and/or Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983. Section 1983 provides for certain governmental liability resulting from constitutional violations, stating that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding . . .

42 U.S.C. § 1983. The Eighth Amendment, specifically, prohibits "cruel and unusual punishment," such as those involving the "unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). The Supreme Court of the United States has held that "deliberate indifference to serious medical needs of prisoners" constitutes wanton infliction of pain, regardless of whether the indifference is "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). Thus, the Individual Defendants argue principally that Plaintiffs' allegations

regarding their conduct do not "rise to the level of deliberate indifference." ECF No. 14-1 at 6; ECF No. 21-1 at 6.

Not every allegation of inadequate medical treatment establishes a claim under the Eighth Amendment. *Estelle*, 429 U.S. at 105. "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." *Shields v. Prince George's Cty.*, No. GJH-15-1736, 2016 WL 4581327, at *6 (D. Md. Sept. 1, 2016) (quoting *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999)). Nor will an "inadvertent failure to provide adequate medical care" suffice. *Estelle*, 429 U.S. at 105. To prevail on a "deliberate indifference" claim, Plaintiff must prove two elements: "(1) that the deprivation of a basic human need, as an objective matter, was sufficiently serious; and (2) that, when viewed from a subjective perspective, prison officials acted with a sufficiently culpable state of mind." *King v. United States*, 536 F. App'x 358, 360 (4th Cir. 2013). Additionally, "[t]o constitute deliberate indifference to a serious medical need, 'the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id.* at 361 (alteration in original).

The Fourth Circuit has explained that "two slightly different aspects of an official's state of mind" must be shown in order to satisfy the subjective component of deliberate indifference. *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). First, the prison official must have known of a serious risk of harm. *Young v. City of Mt. Ranier*, 238 F.3d 567, 575–76 (4th Cir. 2001). Second, the officer must have also recognized that his or her actions were insufficient or "inappropriate in light of the risk." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004). It is not enough "that the officers *should have* recognized" the risk of harm or inadequacy of their

actions; they actually must have perceived the risk. *Id.* (citing *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)) (emphasis in original).

**i. Defendant LCSW Lisa Winkler**

Defendants contend that Plaintiffs failed to establish deliberate indifference on the part of clinical social worker Lisa Winkler. ECF No. 14-1 at 14–15. They claim that "Ms. Winkler is alleged to have had one interaction with Ms. Benton several days before her death," and "Ms. Winkler is not alleged to have witnessed any signs or symptoms indicating that Ms. Benton had a serious medical need." *Id.* at 15. Indeed, the Amended Complaint provides only that Ms. Winkler conducted a single suicide prevention screening on October 9, 2013, several days before Ms. Benton's death. Although the screening indicated that "Ms. Benton had a psychiatric history and a history of drug or alcohol abuse," the Amended Complaint provides no other facts indicating an objectively serious medical need at that time or Ms. Winkler's subjective knowledge and disregarding of that risk. *See Hanlin-Cooney v. Frederick Cty., Md.*, No. CIV. WDQ-13-1731, 2014 WL 576373, at *10 (D. Md. Feb. 11, 2014) (dismissing deliberate indifference claim against prison nurse where plaintiff pleaded insufficient facts showing nurse had subjective knowledge of inmate's suicide risk when she evaluated him); *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (noting that court must focus on the risk of which the official actually knew, and what precautions were taken in response to that risk, not those that "could have been taken"). Thus, because Plaintiffs have failed to plead sufficient facts showing deliberate indifference on the part of Defendant Winkler, the § 1983 claims in Count II against her must be dismissed.

**ii. Defendants P. King, Beaumont, Hosselrode, T. King, Randolph, and Cawley**

With respect to the remaining Defendants, Plaintiffs have adequately stated a claim. Defendant Penny King conducted an intake examination of Ms. Benton, ECF No. 4 ¶ 48, and

also reviewed the suicide prevention screening. *Id.* ¶ 50. Hence, Ms. King had knowledge that Ms. Benton "suffered from high blood pressure, bipolar disorder, unexplained weight loss, an enlarged colon, and drug addiction," and also that she "needed follow-up medical care for her enlarged colon." *Id.* ¶ 48. Ms. King was also aware that Ms. Benton was experiencing withdrawal, as she placed Ms. Benton on a "Benzo protocol." *Id.* Additionally, Ms. King "did detox checks on and/or administered medications to Ms. Benton during her incarceration at the Detention Center and knew she was detoxing, vomiting profusely, refusing meals and had unstable vital signs." *Id.* ¶ 82. Therefore, Plaintiffs have alleged sufficient facts "from which the Court can infer that [Defendant P. King] had actual knowledge of [Ms. Benton's] serious medical need." *See Hanlin-Cooney*, 2014 WL 576373, at *10. The purported failure to call for additional medical help was inappropriate in light of this risk. *See id.*

Defendant Latoya Beaumont reported that Ms. Benton had elevated blood pressure of 153/106 on October 11, 2013. ECF No. 4 ¶ 57. Despite Physician's Orders that Ms. Benton was to receive 0.1 mg of Clonidine for elevated blood pressure, "that order was not carried out." *Id.* Ms. Beaumont also conducted a detox check on Ms. Benton and took her vital signs the next day. Ms. Benton's blood pressure had risen to 167/92 and her pulse had dropped to 36 beats per minute. *Id.* ¶ 62. According to Plaintiffs' submitted expert report, "[a] heart rate of 36/minute represents a life-threatening condition." ECF No. 4-4 at 17. After notifying another nurse, "the only medical care noted by Defendant Beaumont was a second dose of Phenergan and to 'encourage' fluids." ECF No. 4 ¶ 62. Plaintiffs further allege that Ms. Beaumont "did detox checks on and/or administered medications to Ms. Benton during her incarceration at the Detention Center and knew she was detoxing, vomiting profusely, refusing meals and had unstable vital signs." *Id.* ¶ 82. Because Ms. Beaumont allegedly witnessed these objectively

serious symptoms, including the deterioration of Ms. Benton's condition, but took no further action to seek help for Ms. Benton, Plaintiffs state a claim for deliberate indifference against Defendant Beaumont. *See McKissick v. Cty. of York*, No. 1:09-CV-1840, 2011 WL 5117621, at *14 (M.D. Pa. Oct. 25, 2011) (finding sufficient evidence for Eighth Amendment claim where prison nurse delayed or failed to respond to inmate's complaints as his condition was "dramatically worsening").

Next, the Amended Complaint alleges that Defendant Brandon Hosselrode "administered medication to Ms. Benton at least twice during the evening, and despite the fact that Ms. Benton was vomiting profusely, having abdominal cramps, and refusing all meals, Defendant Hosselrode did nothing to see that Ms. Benton received any additional medical care or intervention." ECF No. 4 ¶ 66. The Complaint further states that Defendant Hosselrode "did detox checks on and/or administered medications to Ms. Benton during her incarceration at the Detention Center and knew she was detoxing, vomiting profusely, refusing meals and had unstable vital signs." *Id.* ¶ 82. These allegations are also attributed to Defendants Kristy Randolph and Tara King. "Because consciously withholding medical care can give rise to a plausible claim of deliberate indifference," Plaintiffs have stated a claim against Defendants Hosselrode, Randolph, and King. *Hanlin-Cooney*, 2014 WL 576373, at *10 (citing *Newbrough v. Piedmont Reg'l Jail Auth.*, 822 F. Supp. 2d 558, 578 (E.D. Va. 2011)) (finding claim stated against medical technician where technician recognized inmate was going through withdrawal but knowingly did not prescribe appropriate medication); *see also De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (reversing dismissal of Eighth Amendment claim, noting that "just because [prison staff] have provided [the inmate] with *some* treatment. . . it does not follow that they have necessarily provided her with *constitutionally adequate* treatment") (emphasis in original).

Finally, Defendant Cawley argues that Plaintiffs' claims against him must fail because Plaintiffs fail to allege that he "knew of a substantial risk of harm" or recognized that his actions "were inappropriate in light of a known risk." ECF No. 21-1 at 10. These arguments are not persuasive. The Amended Complaint includes several allegations regarding Defendant Cawley. First, Mr. Cawley allegedly advised Defendant Harrison that Ms. Benton "is just going threw [sic] withdrawals and her body is going to ache," and Ms. Benton was subsequently given "Gatorade to hydrate." ECF No. 4 ¶ 50. Second, on October 12, 2013, Defendant Cawley "administered medication to Ms. Benton at least twice during the day, and despite the fact that Ms. Benton was vomiting profusely, having abdominal cramps, and refusing all meals, Defendant Cawley did nothing to see that Ms. Benton received any additional medical care or intervention." *Id.* ¶ 65. Third, Defendant Cawley had substantial interaction with Ms. Benton on the morning of her death. *Id.* ¶ 71. Mr. Cawley entered Ms. Benton's cell to deliver medication. Cawley reported that Ms. Benton "did not seem to see him" and was in an "altered mental status." *Id.* When he finally got her attention, Ms. Benton reached out and crushed both cups he was trying to give her. *Id.* She eventually took the medication, then grabbed her mattress and began rocking back and forth. *Id.*

Plaintiffs also contend that Mr. Cawley, despite knowing of her condition and attendant mental state, did nothing to provide further assistance or call for a doctor. ECF No. 4 ¶ 71. Instead, Mr. Cawley "issued a memorandum that Ms. Benton not be allowed out of her cell, except for her shower, because she was unsteady on her feet during her detox protocol." *Id.* The Amended Complaint further alleges that Mr. Cawley witnessed Ms. Benton vomiting and refusing to eat during detox checks, but failed to obtain medical help. *Id.* ¶ 82. Indeed, the only reasonable inference here is that Mr. Cawley observed, first-hand, Ms. Benton's condition

worsening rather than improving. Accordingly, Plaintiffs have alleged sufficient facts that Mr. Cawley was aware of an objectively serious medical condition and also recognized that his actions were inadequate.

**B. State Law Claims**

The state law claims for survival action/negligence and wrongful death asserted in Counts I and III against Defendant Winkler shall be dismissed. Under the requirements of the Maryland Health Care Malpractice Claims Act (HCMCA), a claim filed against a health care provider for damage due to a medical action shall be dismissed "if the claimant or plaintiff fails to file a certificate of a qualified expert with the Director attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury." Md. Code, Cts. & Jud. Proc. § 3-2A-04(B)(1). Dr. Cohen's report, while naming Ms. Winkler in a list of other defendants, contains no actual allegations describing her departure from the standard of care. As Plaintiffs' expert report does not attest to a breach of the standard of care attributable to Defendant Winkler, Plaintiffs have failed to comply with the HCMCA with respect to this defendant. Compliance with HCMCA is a conditional precedent to filing in federal court. *See Kimble v. Rajpal*, No. RWT 11CV1457, 2012 WL 3263754, at *4 (D. Md. Aug. 8, 2012) (citing *Davison v. Sinai Hosp. of Baltimore, Inc.*, 617 F.2d 361, 362 (4th Cir. 1980)).

Moreover, in Maryland, a wrongful death action "may be maintained against a person whose wrongful act causes the death of another." *Grinage v. Mylan Pharm., Inc.*, 840 F. Supp. 2d 862, 872–73 (D. Md. 2011) (citing Md.Code, Cts. & Jud. Proc. § 3–902(a)). Thus, a plaintiff only states a claim for wrongful death if a "wrongful act" occurred. *Id.* (citing *Georgia–Pacific Corp. v. Benjamin*, 394 Md. 59, 80 n.6 (2006). A wrongful act is defined as "an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an

action and recover damages if death had not ensued." *Id.* (citing Md.Code, Cts. & Jud. Proc. § 3–901(e)). Here, Plaintiffs have not pleaded sufficient facts that Defendant Winkler committed a "wrongful act." Thus, Counts I and III against Defendant Winkler are dismissed.

However, Defendants have conceded that Plaintiffs were not required to file an expert report to accompany the Certificate of Merit with respect to Individual Defendants P. King, Beaumont, Hosselrode, T. King, Randolph, and Cawley, as they are CNAs and CMTs not defined as "health care providers" within the meaning of the HCMCA. ECF No. 23 at 1; *see also* ECF No. 22 at 11–14. Thus, the state law claims in Counts I and III will proceed against these Defendants.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are granted, in part, denied, in part. All claims are dismissed as to Defendant Winkler, but shall proceed against all other Defendants. A separate Order shall issue.

Date: March 2, 2017

George J. Hazel
United States District Judge