**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| J.F. and D.F., *minors*, | * | |
| *by their guardians and next friends,* | | |
| **CRAIG AND DEBORAH ANN** | * | |
| **BENTON**, *et al.*, | | |
| | | |
| **Plaintiffs,** | * | |
| **v.** | | **Case No.: GJH-16-2177** |
| | * | |
| **CORRECT CARE SOLUTIONS, LLC,** | | |
| *et al.*, | | |
| | * | |
| **Defendants.** | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

This case arises from the death of Melissa Mae Benton at the St. Mary's County

Detention Center (SMCDC) on October 13, 2013. Ms. Benton's parents, both individually and

on behalf of her minor children J.F. and D.F, Ms. Benton's Estate, and Ms. Benton's adult child

Brittany Fleshman filed a lawsuit against the companies and individuals that provided care at the

Detention Center on June 17, 2016, alleging violations of the Eighth and Fourteenth Amendment

and state law negligence and wrongful death claims. Defendants Correct Care Solutions, LLC

("Correct Care"), Conmed Healthcare Management, Inc. ("Conmed"), Ashley Elizabeth

Sampson, Latoya Beaumont, Tara King, Vabian Paden, Nancy Sidorowicz, Penny King, James

Cawley, and Kristy Randolph filed a Motion to Strike Expert Cause of Death Opinion of Marc F.

Stern, MD, MPH, and a Motion for Summary Judgment on that basis. ECF No. 83. Defendants

Correct Care and Conmed filed a separate Motion for Summary Judgment only as to the

constitutional claims. ECF No. 81-1. Defendants Penny King, Beaumont, Randolph, Paden, Tara

King, and Sidorowicz filed Motions for Summary Judgment as to all claims, ECF Nos. 81-2, 81-3, 81-4, 81-5, 81-6, 81-7. Defendants Sampson and Cawley filed Motions for Summary Judgment only as to the constitutional claims. ECF Nos. 81-8, 81-9.

A hearing was held on January 11, 2019. For the following reasons, the Motions to Strike, ECF No. 80, 83, are denied. The Motion for Summary Judgment, ECF No. 81, is granted in part and denied in part.[1]

## I.     BACKGROUND

### A.  Ms. Benton's Death

On October 8, 2013, Ms. Benton was sentenced to prison, taken into custody, and temporarily placed at SMCDC ahead of her pending transfer to a state facility. ECF Nos. 92-2, 92-3, 92-4. Conmed Healthcare Management ("Conmed") had been purchased by Correct Care Solutions ("Correct Care") in 2012. ECF No. 92-5 at 8. In 2014, Conmed contracted with SMCDC to provide onsite healthcare. ECF No. 94-1.

Upon arrival at SMCDC on October 8, Ms. Benton was given an intake examination by Defendant Penny King, a Certified Nursing Assistant ("CNA") and Certified Medication Technician ("CMT") who worked for Conmed. ECF No. 92-7 at 7, 92-9 at 8-9. During this examination, Ms. Benton disclosed use of Xanax, heroin as recently as two weeks before her incarceration, and oxycodone as recently as the day before her incarceration. ECF No. 92-7 at 8. Penny King also included instructions to place Ms. Benton on a protocol for opiate and benzodiazepine detoxification ("detox"). *Id*. at 6, 8. A Physician's Order for opioid withdrawal was generated for Ms. Benton, on which Defendants Nancy Sidorowicz, a physician's assistant, and Melissa Ann Henderson, a registered nurse, are listed as Ms. Benton's clinicians. *Id*. at 4. The order provides twenty separate instructions, including requirements to give Ms. Benton

---

[1] The Court granted Plaintiff's Motion to Unseal, ECF No. 95, at the January 11 hearing. *See* ECF No. 103 at 5.

Phenergan for vomiting, Imodium for abdominal cramps and diarrhea, Clonidine for blood pressure at specific blood pressure readings, and vitamins. *Id*. Defendant Dr. Vabian Lewitt, M.D.'s name appears on Ms. Benton's prescription, which also included a tapering dose of Librium, which controls the symptoms of withdrawal. *Id*. at 13-14. The order also called for recording Ms. Benton's food intake and checking her vital signs three times a day, with instructions to call 911 if her oxygen saturation dropped past 92%. ECF No. 92-7 at 4.

Ms. Benton was placed in a diagnostic holding and medical observation unit. ECF No. 92-10 at 2. CNAs Tara King and James Cawley were on post when Ms. Benton's scheduled dose of Librium on October 8 at 9:00pm was recorded on the Medication Administration Record ("MAR") as "missed." ECF No. 81-10 at 6. Her scheduled dose of Librium on October 9 at 2:00am was recorded as "no show." *Id*. at 18. On the morning of October 9, Defendant PA Sidorowicz conducted a physical examination of Ms. Benton, noting that she had been taking 4-5 Xanax per day. *Id*. at 6. Sidorowicz also recorded a blood pressure of 148/112 and a pulse of 112, vital signs Dr. Stern called "abnormal" in his expert report. *Id*. at 6-7. CNA Penny King conducted a detox check that afternoon at 2:10pm. *Id*. at 8. Though Ms. Benton was due her fourth dose of Librium at this time, Defendant CNA Kristy Randolph withheld the dose due to a blood pressure of 119/90. *Id*. On October 9 at 9:00pm, Ms. Benton's scheduled dose of Librium is shown as "missed" while CNAs Randolph and Beaumont were on post. *Id*. at 18. On October 10, CNA Penny King was to deliver Plaintiff another dose of Librium, but it is recorded on the MAR as "refused." *Id*. at 19. Under the heading of "reason," the CNA wrote "BP [blood pressure]." *Id*.

Ms. Benton's October 11 8:00am dose of Librium was recorded as "held" for "BP." *Id*. That evening, CNA Beaumont performed a detox check at 10:01pm. *Id*. at 9. Ms. Benton had

begun to show multiple symptoms of withdrawal, including elevated blood pressure, tremors, agitation, vomiting, and abdominal cramps. *Id.* CNA Beaumont contacted RN Henderson and recorded that Ms. Benton was given Phenergan and fluids, though the MAR contains no confirmation that Phenergan was actually administered on October 11. *Id*; ECF No. 92-7 at 16-17. Ms. Benton's blood pressure was above the threshold at which the physician's order called for administering Clonidine, but she was not given a dose of the medication at this time. ECF No. 81-10 at 9.

By the morning of October 12, Ms. Benton was described by the occupant of a neighboring cell as "deathly sick," "hugging the toilet," "complaining of being dizzy and feeling feint," and "begging for medication." *Id.* at 10. At 5:05am, after complaining of chest pains, she was taken to the Medical Unit where she was evaluated by CNA Beaumont. *Id.* Her blood pressure was 148/101 and her pulse was 48 (described in Dr. Stern's report as "dangerously slow"). *Id.* CNA Beaumont, having written "deferred to RN" on the Flow Sheet, advised Ms. Benton to "relax and not drink fluids in large gulps but to take sips to stay hydrated." *Id.* She also wrote, "Imodium and Phenergen orders renewed" on the Flow Sheet, but did not record that these drugs were actually given at that time. ECF No. 92-7 at 9, 16-17. At 6:30am, CNA Beaumont conducted a detox check and documented blood pressure of 167/92 and a pulse of 36, a rate Dr. Stern called "very dangerously slow." *Id.* at 21; ECF No. 81-10 at 12. On the detox sheet, Beaumont wrote "Fluids encouraged. Phenergan given," and that she contacted the RN. ECF No. 92-7 at 21. The MAR contains no record that Phenergan was actually administered until 6:13pm that evening. *Id.* at 16-17.

CNA Beaumont's record of deferring to RN Henderson both in the evening of October 11 and twice on the morning of October 12 is corroborated neither by Henderson's statement to the

Sheriff's Department investigator, in which RN Henderson stated only that she received "one late night call from a medical technician," nor by RN Henderson's later statement in her deposition stating that she only recalled being called once in the morning. ECF No. 81-10 at 11.

At 10:10pm the evening of October 12, CNA Sampson evaluated Ms. Benton for head pain after a fall. *Id*. at 13. CNA Sampson performed a skin turgor test to evaluate Ms. Benton for dehydration, and, finding no significant signs of dehydration, denied Ms. Benton's request to go to the hospital. *Id*. Correctional officers recorded that Ms. Benton refused all three meals that day, as she was unable to hold anything down. ECF No. 92-7 at 19. CNA Sampson did not administer Phenergan in response to the vomiting. ECF No. 81-10 at 20.

On October 13, just after 6:30am, a correctional officer notified CNA Cawley of Ms. Benton's persistent vomiting. *Id*. at 13. CNA Cawley did not administer Phenergan in response to this report. *Id*. at 20. A correctional officer testified that by around 10:00am, Ms. Benton was a "different person," as she was weak and unsteady and "had a blank stare and did not seem to even see the medic within her cell," and the officer recalled informing CNA Cawley about her confusion. ECF No. 81-10 at 13-14. CNA Cawley also testified that Ms. Benton had a "slightly altered mental status," as though "time and place wasn't present." *Id*. at 14. A correctional officer recalled that when she asked Ms. Benton for a Gatorade bottle, Ms. Benton instead handed her a shoe. *Id*. at 15. By 11:19am, a correctional officer was reporting that Ms. Benton still could not hold down fluids, but she was still not given any Phenergan. *Id*. at 20. At 1:16pm, CNA Cawley filed a "Form 35" to order Ms. Benton held in her cell due to "her being unsteady on her feet during detox." *Id*.

At 3:25pm, CNA Cawley performed Ms. Benton's final detox check. *Id*. at 15. At that check, Ms. Benton "seemed more alert," and her vitals were within normal limits. *Id*. at 16. Her

blood pressure had dropped to 106/68. *Id*. She was, however, still vomiting. *Id*. at 20. CNA

Cawley took no further action. *Id*. At 5:58pm, Ms. Benton was found unresponsive in her cell.

*Id*. She was pronounced dead at the hospital across the street from the detention center. *Id*. For

the second day in a row, she had refused all meals. ECF No. 92-7 at 19. In the end, staff failed to

administer six of Ms. Benton's fourteen scheduled doses of Librium. ECF No. 81-10 at 18. She

also missed doses of Thiamine and vitamins. *Id*. at 14.

      B.  <u>Dr. Marc F. Stern's Expert Testimony</u>

      Plaintiffs offer a report from Dr. Marc F. Stern in support of their allegations. *See* ECF

No. 81-10. Dr. Stern is a board-certified internist specializing in correctional health care. *Id*. at 1.

From 2002-2008, he served as the Assistant Secretary for Health Care in the Washington State

Department of Corrections. ECF No. 90-4 ¶ 4. He has extensive experience directly and

indirectly supervising, hiring, firing, and teaching RNs, PAs, and primary care physicians. ECF

No. 81-10 at 2. He also volunteers as a clinician at the Olympia Free Clinic. ECF No. 90-4 ¶ 5.

      Dr. Stern testified that he consistently reads peer-reviewed publications in general

medicine and other medical literature; he himself peer reviews four to six draft medical

manuscripts a year. *Id*. He also testified that he keeps himself "current on the medical literature

with respect to withdrawal from opiates and benzodiazepines." *Id*. Earlier in his career, from

1982 to 1998, he "regularly participated in mortality and morbidity reviews" and, as a clinician,

has signed dearth certifications and "trained physician trainees in the proper completion of death

certifications." *Id*. ¶ 6.

      In his report, Dr. Stern opines that "Ms. Benton died of dehydration due to some

combination of acute withdrawal from benzodiazepines and opiates." ECF No. 81-10 at 23. He

initially concluded that, "[w]hile this is the most likely diagnosis, there is also good evidence

supporting that Ms. Benton died of the sole effects of benzodiazepine withdrawal." *Id*. He later

supplemented his report to state that he believes it is "at least as likely" that Ms. Benton died

from withdrawal as it is that she died from dehydration. *Id*. at 36. He concedes that it is possible,

as the Medical Examiner found, that Ms. Benton died instead of a cardiac arrhythmia. *Id*. at 24.

Regardless of the precise "mechanism(s) [that] played the most prominent role in Ms.

Benton's death," Dr. Stern contends that Conmed's staff committed a lengthy list of errors that,

in his opinion, were causally related to Ms. Benton's death. *Id*. These errors include: Dr. Paden's

failure to notice the missed doses of Librium on the MAR and rectify the failure to deliver the

medication; the missed or withheld doses of Librium by CNAs Tara King, Penny King,

Randolph, and Cawley; the failure of CNAs Sampson, Beaumont, and Cawley to administer

Phenergan; CNA Beaumont's treatment during Ms. Benton's 5:05pm visit to the Medical Center

on 10/12; the treatment given during the 10/12 6:30pm detox check, whether that treatment was

determined by RN Henderson or CNA Beaumont; the failure of Conmed staff to respond to Ms.

Benton's refusal to eat for the final 36 hours of her life; CNA Sampson's treatment during the

10/12 10:10pm detox check; CNA Cawley's treatment in response to the report of Ms. Benton's

changed mental state at 10:00am on 10/13; CNA Cawley's failure to respond to Ms. Benton's

unsteadiness on her feet and altered mental state the morning of 10/13; and CNA Cawley's

treatment in response to Ms. Benton's drop in blood pressure and changed mental state at

3:25pm on 10/13. *Id*. at 6-16, 31. In sum, Dr. Stern believes that treating Ms. Benton's vomiting,

diarrhea, elevated blood pressure, and delirium would have eliminated both her dehydration and

her cardiac stress factors, and likely prevented her death. *Id*. at 24.

Dr. Stern also criticizes Conmed's policies and procedures as causative of Ms. Benton's

death. He explains that Conmed's CNAs customarily made treatment decisions beyond their

legal and safe scope of practice: for instance, by choosing to withhold Librium due to blood pressure despite no physician having made such an order or by ignoring the thresholds specified in the physician orders to trigger the administration of Clonidine based on their own "clinical judgment." *Id*. at 19-21. Though CNAs train for 100 hours and RNs train for two to four years, Dr. Stern contends that the circumstances surrounding Ms. Benton's death are "replete with examples of complex nursing activities that required nursing judgment—something reserved for the RN—but that were performed by CNAs at SMCDC and, further, activities which, based on the totality of evidence in this case, have all become routine parts of the CNAs' job duties." *Id*. at 27. For instance, Conmed's Rule 30(b)(6) witness conceded that its CNAs made clinical judgments as to whether a blood pressure reading was abnormal enough to prompt a call to a nurse or physician. *Id*. at 28. Dr. Stern argues that this problem was exacerbated in this case by the absence of a withdrawal protocol for benzodiazepine; Conmed staff, including CNAs, instead relied upon an order set for opiate withdrawal or upon their own judgment. *Id*. at 24-25. Dr. Stern also asserts that the Opiate Protocol, Conmed's Flow Sheet utilized as part of the Opiate Protocol, and Conmed's Intoxication and Withdrawal Policy are so "woefully inadequate" as to be causally linked to the death of Ms. Benton. *Id*. at 7.

Dr. Stern further criticizes RN Henderson, who supervised the CNAs, for being aware of and condoning the CNAs' custom of using their own judgment to make nursing assessments. *Id*. at 29. He similarly faults Dr. Paden who, despite his role as attending physician and facility medical director, had only "minimal" involvement in overseeing medical care and conceded that the "nurses there, they basically ran the . . . show. And basically I was there basically (sic) as the physician because they needed someone with credentials in order to – for the, for the process to move forward." *Id*. at 30.

## II.     STANDARD OF REVIEW

### A.  *Daubert* Motion

Trial judges have a responsibility to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993). Because expert witnesses "have the potential to 'be both powerful and quite misleading' . . . judges must conduct 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (quoting *Daubert*, 509 U.S. at 592-93, 595). A party seeking admission of expert testimony bears the burden of establishing admissibility by a preponderance of the evidence. *Id*.

### B.  Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The burden is on the moving party to demonstrate that there exists no genuine dispute of material fact. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). To defeat the motion, the nonmoving party must submit evidence showing facts sufficient for a fair-minded jury to reasonably return a verdict for that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III.     DISCUSSION

### A.  *Daubert* Motion

The Federal Rules of Evidence provide that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Defendants make several challenges to the admissibility of Dr. Stern's cause of death opinion. They contend (1) Dr. Stern does not have the knowledge, skill, experience, or training to testify as to a cause of death, (2) there is no medical literature to support his cause of death opinion, (3) it contradicts the clear findings of the State Medical Examiner, and (4) he cannot rule out the possibility that Ms. Benton died from cardiac arrhythmia. *See* ECF No. 83.

First, "experience alone, or in conjunction with 'other knowledge, skill, training or education,' can provide sufficient foundation for expert testimony." *Young v. Swiney*, 23 F. Supp. 3d 596, 611 (D. Md. 2014) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). But an expert "may not offer an opinion where the subject matter goes beyond the witness's area of expertise." *Id*; *see, e.g., Berry v. City of Detroit*, 25 F.3d 1342, 1351-52 (6th Cir. 1994) (holding that it was improper for an expert qualified in the field of Forensic Psychiatry to offer testimony on the effect of disciplinary shortcomings on the future conduct of the City's entire department of police officers). Still, "the fit between an expert's specialized knowledge and experience and the issues before the court need not be exact." *Smith v. Cent. Admixture Pharmacy Servs., Inc.*, No. AW-07-3196, 2010 WL 1137507, at *2 (D. Md. 2010). "[A]n expert's opinion is helpful to the trier of fact . . . to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion." *Id*. (internal quotations omitted).

Here, Dr. Stern has sufficient knowledge, skill, experience, and training to testify as to cause of death. Earlier in his career, he "regularly participated in mortality and morbidity reviews to determine the cause of death of patients and lessons learned." ECF No. 90-4 ¶ 6. He has reviewed deaths of persons in custody of correctional facilities, signed "scores, if not hundreds," of death certifications, and published articles on mortality that required research into cause-of-death determinations. *Id*. The Court is thus satisfied that Dr. Stern has the requisite "special skill, knowledge, or experience" to testify as to the cause of death.

Second, expert testimony must be based on sufficient facts or data. *Swiney*, 23 F. Supp. 3d at 610. Defendants contest the existence of any factual support as to his conclusion that she was dehydrated, asserting that because Dr. Stern could not conclusively state how much fluid Ms. Benton was consuming, he could not establish that she was dehydrated. *Id*. This argument is not persuasive. There is ample evidence in the record of Ms. Benton's vomiting, blood pressure, and elevated heart rate, all of which can be symptoms of dehydration. ECF 83-4 at 11. There is also sufficient evidence to infer that Ms. Benton was vomiting for long enough to lose enough fluids to become dehydrated. *See* ECF 81-10 at 9, 20 (establishing that Ms. Benton was vomiting from 8:00am on October 11 through mid-day on October 13).

Dr. Stern's report also includes sufficient factual support for his conclusion that Defendants caused Ms. Benton's death. Dr. Stern opines that Defendants' acts and omissions led Ms. Benton to become dehydrated, suffer from withdrawal, *and* experience unnecessary stress on her heart. ECF No. 81-10 at 24. On multiple occasions, Dr. Stern states that if Defendants had exercised the proper standard of care, Ms. Benton would have received different treatment that would have alleviated each of these problems, and thus likely saved her life regardless of whether the final cause of death was dehydration, withdrawal, or cardiac arrhythmia. *See, e.g.,*

ECF No. 81-10 at 10 (failure to administer Phenergan allowed the vomiting that caused dehydration and stress on the heart to continue).

Third, expert testimony must be the product of reliable principles and methods applied to the facts of the case. *Swiney*, 23 F. Supp. 3d at 610. Expert scientific testimony must be grounded in the methods and procedures of science, as opposed to an expert's subjective belief or unsupported assumptions. *Id*. To determine whether an expert's reasoning or methodology is reliable, courts should consider:

> (1) whether the particular scientific theory has been or can be tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether there are standards controlling the method; and (5) whether the technique has gained general acceptance in the relevant scientific community.

*Daubert*, 509 U.S. at 593-94. Defendants contend that there is no medical literature to support Dr. Stern's cause of death opinion. ECF No. 83 at 9. But the Fourth Circuit has made it clear that "expert testimony need not be based upon identical case studies." *Benedi v. McNeill-P.P.C., Inc.*, 66 F.3d 1378, 1384 (4th Cir. 1995); *see also Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999). Rather, an expert must show that "the methodology employed by the expert in reaching his or her conclusion is sound." *Id*.

Here, Dr. Stern relied on differential diagnosis, "a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry*, 178 F.3d at 262. The Fourth Circuit has consistently found that "a reliable differential diagnosis provides a valid foundation for an expert opinion." *See id*. at 263 (holding that a doctor's reliance on differential diagnosis was sufficient to establish the reliability of his opinion, even though he had "no epidemiological studies, no peer-reviewed published studies, no animal studies, and no laboratory data" to support his conclusion). Dr.

Stern's report also carefully details at least four substantive distinctions between his conclusions and that of the Medical Examiner. ECF No. 81-10 at 23.

Defendant next argues that Dr. Stern's opinion is speculative because he does not rule out the possibility that Ms. Benton died from cardiac arrhythmia. But nothing in *Daubert* requires an expert's opinion be offered with absolute certainty. *See, e.g., United States v. Baller*, 519 F.2d 463, 466 (4th Cir. 1975) ("Absolute certainty of result or unanimity of scientific opinion is not required for admissibility."). Therefore, the Court holds that Dr. Stern's conclusions are the product of reliable principles and methods, and that he has applied these principles and methods to the facts of this case. Dr. Stern's expert testimony as to the cause of Ms. Benton's death is admissible, and Defendants' Motion to Dismiss relying on the exclusion of his report is denied.

B. State Law Claims

In Maryland, a wrongful death action "may be maintained against a person whose wrongful act causes the death of another." Md. Code Ann, Cts. & Jud. Proc. § 3-902. A wrongful act is "an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued." *Id.* § 3-901(e). In Maryland, an action for medical negligence must establish "(1) the applicable standard of care, (2) that this standard of care has been violated, and (3) that this violation caused the harm complained of." *Karl v. Davis*, 639 A.2d 214, 218 (Md. Ct. Spec. App. 1994). "While expert opinion must be based upon more than mere speculation, it need not be expressed with absolute certainty." *Id.* at 219. Rather, expert testimony must show causation to a "reasonable degree of probability;" that is, there must be more evidence in favor of the causation than against it. *Barnes v. Greater Baltimore Med. Ctr., Inc.,* 210 Md. App. 457, 481 (Md. Ct. Spec. App. 2013).

Both negligence and wrongful death actions require the act complained of to be a proximate cause of the harm alleged. *Pittway Corp. v. Collins*, 409 Md. 218, 243 (Md. 2009). To satisfy this requirement, the act must be both (1) a cause-in-fact, and (2) a legally cognizable cause. *Id.* Where "two or more independent negligent acts bring about an injury . . . the substantial factor test" determines whether causation-in-fact exists. *Id.* at 244. The substantial factor test asks whether it is "'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Id.* (quoting *Reed v. Campagnolo*, 332 Md. 226, 240 (Md. 1993). Under this test, courts consider:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; and
> (c) lapse of time.

*Warr v. JMGM Group, LLC*, 433 Md. 170, 246 (Md. 2013) (quoting Restatement (Second) of Torts § 433. Furthermore:

> If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's innocent, tortious, or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability.

*Certain-Teed Prods. Corp. v. Goslee Roofing & Sheet Metal, Inc.*, 26 Md. App. 452, 470 (Md. Ct. Spec. App. 1975) (quoting Restatement (Second) of Torts § 439).

C.   Constitutional Claims

Plaintiffs also allege that Correct Care, Conmed and Individual Defendants each violated Ms. Benton's constitutional rights. As an initial matter, Plaintiffs raise, for the first time in their Opposition to Defendants' Motion for Summary Judgment, a failure-to-train theory of deliberate

indifference. *See* ECF No. 92 at 37. The First Amended Complaint contains no reference to this theory. *See* ECF No. 4 ¶¶ 98-105. A party may not raise a new claim in a brief in opposition to summary judgment. *See, e.g., Barclay White Shanska, Inc. v. Batelle Mem'l Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008). Therefore, the Court will not consider the failure-to-train theory at this time, and will only consider whether the institutional defendants have a policy or custom that constitutes deliberate indifference.

Prison officials violate the Eighth Amendment when they act with "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Eighth Amendment is made applicable to the states by the Fourteenth Amendment. *Id.* at 101. This indifference may be "manifested by prison doctors in their response to the prisoner's needs," *id.*, or by a municipality's policy or custom, *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003); *see also Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (holding that a plaintiff survived a summary judgment motion on the issue of deliberate indifference where she presented evidence that a correctional facility had an unwritten policy "not to require any kind of formal coordination of medical care").

The Fourth Circuit has recognized that "the principles of § 1983 municipal liability articulated in *Monell* and its progeny apply equally to a private corporation" contracting to provide correctional services. *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999). In the case of a municipality's policy or custom, the question is whether the policy or custom is so plainly inadequate that it is "highly predictable" that it will result in the violation of constitutional rights, *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997), or whether the entity has actual or constructive notice that its policy or custom does not prevent constitutional violations, *id.* at 407. Notice is most often established by showing a pattern of tortious conduct.

*Id.* But the Supreme Court has also "left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." *Connick v. Thompson*, 563 U.S. 51, 63 (2011) (quoting *City of Canton, Oh. V. Harris*, 489 U.S. 378, 390 n.10 (1989). "To serve as a basis for liability under § 1983, the policies or customs of a municipality must be 'the moving force [behind] the constitutional violation.'" *Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 671-72 (D. Md. 2003) (quoting *Canton*, 489 U.S. at 389).

In the case of an individual medical provider, "a judicial assessment of deliberate indifference has two aspects—an objective inquiry and a subjective inquiry." *Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018). To satisfy the objective inquiry, "the inmate's medical condition must be serious—one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* To satisfy the subjective inquiry, the plaintiff must show that the provider "knows of and disregards an excessive risk to inmate safety or health." *Id.* at 755 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official must have both known of a serious risk of harm and recognized that his or her actions were insufficient or "inappropriate in light of that risk." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004). A finder of fact may conclude that an official knew of a substantial risk from the very fact that the risk was "so obvious . . . because he could not have failed to know of it." *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995). "Similarly, a factfinder may conclude that the official's response to a perceived risk was so patently inadequate as to justify an inference that the official actually recognized that his response to the risk was inappropriate under the circumstances." *Parrish*, 372 F.3d at 303.

The Court will apply these standards to each Defendant in turn.

Dr. Vabian Paden

Dr. Paden was the attending physician and facility medical director at SMCDC. ECF No. 81-10 at 30. According to Conmed policy, Dr. Paden was responsible for "[d]eveloping operational health policies," "[e]stablishing systems for coordination of care among multidisciplinary health care providers," and "[d]eveloping and implementing a quality management program." Dr. Stern contends that Dr. Paden breached his duty of care in two ways. First, though he was responsible for reviewing patient charts, during his October 11 chart review he failed to notice that the MAR reflected that Ms. Benton was missing doses of Librium. ECF No. 92-13 at 8-10. Second, he argues that Dr. Paden either tolerated or created the CNAs' custom of practicing medicine beyond their safe scope of practice. ECF No. 81-10 at 31.

Dr. Stern consistently contends that the failure to deliver Librium to Ms. Benton caused her death, *see, e.g.,* ECF No. 81-10 at 19 ("Staff's failure to administer [Librium, Phenergan, and Imodium] as ordered therefore also played a central causative role in her death."). Dr. Paden admitted that he would have taken action if he had known about the four doses that had already been missed by October 11. ECF No. 92-13 at 13-14. Dr. Stern also states that "the customs and practices tolerated, if not created, by Dr. Paden materially contributed to Ms. Benton's death." ECF No. 81-10 at 31. In general, Dr. Stern argues that Ms. Benton's death was caused first by the failure to administer to her the proper medications, then to acts and omissions by CNAs acting beyond the scope of their practice. Dr. Paden's negligence, if proved, contributes to both causes of harm. And it cannot be said that these allegedly negligent acts created a harmless situation acted upon by other forces; rather, they created conditions that aggravated the harm caused by the failure to deliver medication to Ms. Benton. A reasonable jury could thus conclude

that Dr. Paden was negligent both in reviewing the MAR and in carrying out his duties to develop operational health policies and to develop and implement a quality management program. A reasonable jury could also conclude that these negligent acts and omissions were a substantial factor in Ms. Benton's death. Therefore, Dr. Paden's Motion for Summary Judgment on Counts I and III is denied.

But because Dr. Paden never treated Ms. Benton, and no evidence suggests he became subjectively aware of Ms. Benton's deteriorating condition, there is no genuine dispute as to whether he knew of and disregarded an excessive risk to her health. Therefore, there is no dispute of material fact as to whether Dr. Paden was deliberately indifferent to Ms. Benton's needs, and his Motion for Summary Judgment on Count II is granted.

PA Nancy Sidorowicz

PA Sidorowicz only saw Ms. Benton twice during her incarceration at SMCDC: once for her initial assessment and once for a detox check on October 10. *See* ECF No. 92-7 at 7, 9. Though Plaintiffs assert that Sidorowicz's assessments of Ms. Benton were "lacking," because she did not measure a baseline temperature or breathing rate and did not record the precise strength of Xanax Ms. Benton had been taking prior to her incarceration, Dr. Stern never suggests that these omissions caused Ms. Benton either suffering or death. Plaintiffs also suggest Sidorowicz was negligent by failing to "follow up" on Ms. Benton's care, but they never establish any specific acts that Sidorowicz had a medical duty to perform and failed to complete. Therefore, there is no genuine dispute of material fact as to whether Sidorowicz caused the suffering or death of Ms. Benton, and her Motion for Summary Judgment as to all claims is granted.

CNA Latoya Beaumont

Plaintiffs contend that CNA Beaumont caused the suffering and death of Ms. Benton because she failed to report a higher-than-expected pulse during the October 10 8:35pm detox check. In his deposition, Dr. Stern opines that the failure to report the pulse was "an error that, had it not been made, it would have improved her chances of living." ECF No. 92-21 at 18. CNAs Beaumont and Randolph were also on post while Ms. Benton "missed" her October 9 9:00pm dose of Librium.

CNA Beaumont saw Ms. Benton three times in succession: for a detox check at 10:01pm on October 11, for a Medical Unit treatment at 5:05am on October 12, and for another detox check at 6:30am on October 12. During the 5:05am visit, Ms. Benton was complaining of chest pains, vomiting, and diarrhea. By 6:30am her blood pressure was 167/92 and her pulse was 36.

The precise nature of Beaumont's treatment during these visits is in dispute. It is undisputed that Beaumont did not administer Clonidine during these hours, but in response to the complaints of chest pain "encouraged" fluids and advised Ms. Benton to "relax." It is unclear whether she administered Phenergan—the flow sheet says she did at 5:05am and 6:30am, but the MAR says she did not. While Beaumont says she contacted or deferred to the judgment of RN Henderson for each of these visits, RN Henderson reports only one call from a medical technician during this period, either late night or in the morning.

Dr. Stern is extremely critical of the treatment Ms. Benton received during the early morning hours. He first explains that "chest pain is a serious medical need, and subjectively any health care professional—if not any reasonable lay adult—would know that failure to address chest pain places an individual at tremendous risk of harm." ECF No. 81-10 at 12. By treating complaints of chest pain only with advice to "relax" and sip fluids, rather than ensuring proper medical evaluation, Dr. Stern claims CNA Beaumont prevented the recognition and treatment of

her "deteriorating physiologic state, which in turn, more likely than not, would have prevented her death." *Id.*

He also states that failing to administer Phenergan and Imodium for the vomiting and diarrhea "hastened Ms. Benton's dehydration and is therefore causally linked to her death." ECF No. 81-10 at 11. Finally, he argues that her pulse rate

> may very well have independently contributed to her collapse and death, and thus failure to appropriately evaluate and address this finding may have been causally related to Ms. Benton's death . . . proper medical evaluation of Ms. Benton would have led a competent evaluator to recognize and treat Ms. Benton's deteriorating physiologic state, and, more likely than not, prevented her death.

*Id.* at 12. A jury could find that each of these negligent acts were substantial factors in Ms. Benton's death; none of these acts created a harmless situation that required additional outside forces to become dangerous, as they each contributed to the worsening of Ms. Benton's physiologic state. Whether CNA Beaumont or RN Henderson made these decisions with regards to Ms. Benton's treatment, and should thus be held responsible for any resulting harm, is a question of fact to be determined by the jury. But because a reasonable jury could find that these acts were a cause-in-fact of Ms. Benton's suffering and death, summary judgment on Counts I and III would be inappropriate.

Likewise, there remains a genuine dispute of material fact as to whether the objective and subjective elements of the deliberate indifference claim have been met. Ms. Benton complained of chest pain and had a pulse rate of 48 at 5:05am and 36 at 6:30am. A reasonable jury could conclude that any of these symptoms individually, let alone all of them together, are serious enough that "even a lay person would easily recognize the necessity for a doctor's attention." *Formica*, 739 F. App'x at 754. A jury could also conclude that the treatment given to Ms. Benton—advice to relax and sip water—was so "patently inadequate as to justify an inference

that the official actually recognized that [her] response to the risk was inappropriate." *Parrish*, 372 F.3d at 303. There is thus sufficient evidence to proceed to trial on Count II as to CNA Beaumont.

CNA Tara King

CNA Tara King is alleged to have failed to deliver either one or two doses of Librium to Ms. Benton, with the MAR reflecting "missed" and "no show" while she was on duty the evening of October 8 and the early morning of October 9, respectively. *See* ECF Nos. 81-10 at 6; 92-7 at 13. Dr. Stern consistently argues that the failure to administer Librium was "causally related to Ms. Benton's death." ECF No. 81-10 at 6, 92-21 at 4-5. He emphasized that "Librium was arguably the most important medication in the withdrawal protocol." ECF No. 81-10 at 8. When asked about the impact of missing just one dose, Dr. Stern grants that he cannot "say one way or the other how much . . . one individual dose would have made a difference had everything else been done differently . . . But I certainly am prepared to say that it contributed." ECF No. 92-21 at 5.

Defendants contend that these facts, taken as true, are insufficient to establish that Tara King's actions were a substantial factor in Ms. Benton's suffering and death. The Court disagrees. Ms. Benton did not receive six of fourteen scheduled doses of Librium. Dr. Stern need not have opined that missing an individual dose would have, by itself, caused Ms. Benton's death; rather, the question is whether missing an individual dose "create[s] a force or series of forces which are in continuous and active operation up to the time of the harm." *Pittway Corp.*, 409 Md. at 244. Nor must Dr. Stern have used the legal term-of-art "substantial factor" to have established a genuine dispute of material fact. If CNA Tara King was responsible for and failed to deliver Librium on the evening of October 8 and the morning of October 9, she created the

dangerous conditions that led to Ms. Benton's further deterioration over the following days. Dr. Stern's opinion that a missed dose "contributed" to Ms. Benton's death is thus sufficient to introduce a genuine dispute of material fact as to causation. *See also Franklin v. Gupta*, 81 Md. App. 345, 361 (Md. Ct. Spec. App. 1990) (holding that expert testimony satisfied causation requirement where expert identified five deviations from the standard of care by nurse and doctor, and opined that absent each of these mistakes, "the events would not have occurred, or would have been less likely to have occurred, much less likely").

There also remains a genuine dispute of material fact as to the deliberate indifference claim against CNA Tara King. She was objectively aware that Ms. Benton was suffering from withdrawal. *See* ECF No. 92-25 at 3 (admitting she would have known that Ms. Benton was on the detox protocol). Withdrawal is a serious medical condition that had "been diagnosed by a physician as mandating treatment." *Formica*, 739 F. App'x at 754. She also knew that withdrawal was treated with Librium. ECF No. 92-25 at 3-4. Dr. Stern explained that there was no legitimate medical reason to fail to give Ms. Benton the Librium, and a decision to withhold this medication was outside of the CNA's legal scope of practice. ECF No. 81-10 at 8. Therefore, a reasonable jury could conclude that she "knew of and disregarded an excessive risk" to Ms. Benton's safety or health. *Formica*, 739 F. App'x at 756. CNA Tara King's Motion for Summary Judgment is denied as to all counts.

<u>CNA Penny King</u>

Dr. Stern alleges that CNA Penny King caused Ms. Benton's suffering and death only by failing to deliver the October 10 8:00am dose of Librium. *See* ECF No. 81-10 at 19. The causation analysis for CNA Penny King is the same as the above analysis for CNA Tara King. There is some dispute, however, as to whether CNA Penny King attempted to deliver this dose of

Librium. The MAR shows this dose as having been "Refused," but under the heading of "Reason," CNA Penny King wrote "BP" for blood pressure. *Id*. These recordings are inconsistent; if Ms. Benton refused this dose of Librium, it defies belief that she did so because of her blood pressure. There is sufficient evidence in the record to conclude that the MARs were kept "sloppily" and "inaccurately," *id*. at 17, and on one other occasion a CNA chose to withhold Librium due to blood pressure. *Id*. at 8, 18. Therefore, a reasonable jury could conclude that this dose of Librium was deliberately withheld, rather than refused by Ms. Benton. CNA Penny King's Motion for Summary Judgment is denied as to all counts.

CNA Kristy Randolph

CNA Randolph withheld Ms. Benton's October 9 2:00pm dose of Librium due to her blood pressure readings. *Id*. Dr. Stern emphasized that no blood pressure reading could have justified this decision and, in any case, such a judgment was outside of CNA Randolph's legal scope of practice. *Id*. For the same reasons as CNAs Penny King and Tara King, CNA Randolph's Motion for Summary Judgment is denied as to all counts.

CNA Ashley Sampson

CNA Sampson evaluated Ms. Benton on October 12 at 10:10pm after head pain arising from a fall, ultimately denying Ms. Benton's request to go to the hospital. *Id*. at 13. Dr. Stern concedes that CNA Sampson correctly recognized that the fall could have been a sign of dehydration, and that the skin turgor test she performed is a valid test to measure dehydration. *Id*. However, Dr. Stern also explains that "it is only one test and cannot and should not have been used as the sole source of information," and offers numerous other evaluations that he states would have likely revealed evidence that Ms. Benton was dehydrated. *Id*. He also emphasized that CNA Sampson "managed this acute episode independently, beyond her scope of practice,

constituting the practice of nursing or medicine without a license," and that her failure to elevate this incident was "illegal and competent" and "causally related to Ms. Benton's death." *Id*.

These facts are insufficient for a jury to conclude that CNA Sampson was deliberately indifferent to Ms. Benton's needs. A fall and a request to go to the hospital is strong evidence of the presence of a serious medical condition, and it is clear that CNA Sampson found this condition worthy of treatment, as she performed a skin turgor test. But Plaintiffs have not introduced evidence that CNA Sampson knew that this test was an inadequate method of determining whether Ms. Benton was dehydrated, nor have they offered any evidence from Dr. Stern or otherwise that the test is so "patently inadequate" to infer that CNA Sampson recognized it was inappropriate. Therefore, CNA Sampson's motion for summary judgment as to Count II is granted.

CNA James Cawley

On the morning of the final day of Ms. Benton's life, CNA Cawley observed that she was "a different person" with a "slightly altered mental status" and "a blank stare" who was "unable to take medicine on her own," and was unsteady on her feet. ECF No. 81-10 at 13-14. An apparently alarmed correctional officer repeatedly notified CNA Cawley regarding Ms. Benton's persistent vomiting. *Id*. That officer also testified that when she asked Ms. Benton for a Gatorade bottle, Ms. Benton first handed her a shoe, and then handed her court paperwork. *Id*. at 15. CNA Cawley's only reaction to these symptoms was to file a "Form 35," which required Ms. Benton to remain in her cell due to her unsteadiness. *Id*. Dr. Stern criticizes these as clinical assessments made outside the scope of CNA Cawley's practice that was causally related to Ms. Benton's death. *Id*.

There can be little question that the evidence presented, if true, establishes an objectively serious medical situation. Even the correctional officer, a lay person, recognized that Ms. Benton's condition required treatment. CNA Cawley observed this "altered mental status" firsthand, and his response—to require Ms. Benton to stay in her cell—amounts to no treatment at all. This evidence is sufficient for a jury to conclude that CNA Cawley was deliberately indifferent to Ms. Benton's needs; therefore, his motion for summary judgment as to Count II is denied.

RN Melissa Henderson

Because it remains unclear whether and when CNA Beaumont, in fact, contacted and "deferred" to RN Henderson in her treatment of Ms. Benton, there is a genuine dispute of material fact as to whether the acts and omissions of CNA Beaumont during the evening of October 11 and the early morning of October 12 can be attributed to RN Henderson. If CNA Beaumont informed RN Henderson that Ms. Benton was complaining of chest pain and Henderson advised only that Ms. Benton should "relax" and sip water, a reasonable jury could find that RN Henderson was deliberately indifferent to Ms. Benton's needs for the same reasons described above. Her Motion for Summary Judgment as to Count II is thus denied.

Correct Care and Conmed

In Maryland, CNAs train for 100 hours and are certified to assist a registered nurse in collecting data for a nursing assessment, collect and record routine health data identified by the nurse, identify when a patient's condition or behavior has changed, and provide feedback to the nurse. *See* ECF No. 81-10 at 27. Registered nurses, on the other hand, train for two to four years, hold a diploma or degree from a registered nursing education program and are licensed. Md.

Code Regs. 10.27.01.05. Notably, Maryland law requires that the following nursing functions not

be delegated to CNAs:

> (1) The nursing assessment including, but not limited to, the admission, shift, transfer, or discharge assessment;
> (2) Development of the nursing diagnosis;
> (3) The establishment of the nursing care goal;
> (4) Development of the nursing care plan;
> (5) Evaluation of the client's progress, or lack of progress, toward goal achievement; and
> (6) Any nursing task which requires nursing knowledge, judgment, and skill.

Md. Code Regs. 10.27.11.05.

Plaintiffs have offered sufficient evidence for a jury to conclude that Conmed and Correct

Care had a policy or custom of allowing CNAs to make medical judgments outside their legal

scope of practice. In this case, the record is replete with evidence of various CNAs making these

judgments. Dr. Stern asserts that CNAs Cawley, Randolph, Penny King, Sampson, and

potentially Beaumont (either her or the RN wrote a stat order for Phenergan) all operated beyond

the scope of their practice by making clinical assessments and diagnoses, deviating from

physician's orders, and withholding medication. *See* ECF No. 81-10 at 5, 8, 9-10, 13, 16. CNA

Sampson stated that, in general, she would determine whether to follow a doctor's orders by

using her "clinical judgment." *Id.* at 28. CNA Randolph admitted that she might make a decision

to withhold medication without talking to anyone. *Id.* at 27-28. RN Henderson admitted that

CNAs used their judgment to determine whether a patient's abdominal cramps and diarrhea

warranted Imodium, and that CNAs had the discretion to determine, based on their own

judgment, when a patient's symptoms warranted calling the RN or physician. *Id.* at 29. These

admissions suggest she was "aware of, and condoned, the fact that CNAs were using their own

judgment to make nursing assessments." *Id.* Importantly, Conmed's 30(b)(6) witness made a

similar admission, explaining that a CNA was to make a clinical judgment as to when a patient's

blood pressure was outside of the normal limit, *see id*. at 28, thus demonstrating that the practice was not limited to the instant case. Defendants point to the array of policies the CNAs were supposed to follow; but if a policy is not being followed by anyone at an institution, it is no more than a piece of paper. *See Glisson*, 849 F.3d at 379 ("It does not matter if the policy was duly enacted or written down."). Though not all of the CNAs' operations beyond the scope of their practice are alleged to have caused Ms. Benton's death, many are, including: the withholding of Librium, Phenergan, and Immodium; CNA Beaumont's treatment on 10/12; and CNA Sampson's treatment the evening of 10/12.

The question remains whether it is "highly predictable" that allowing CNAs to manage beyond the scope of their practice will result in constitutional violations. This is a "quite narrow" path to municipal liability, but it is met here. *Glisson*, 849 F.3d at 387. If proven, the allegations against Conmed reflect no routine policy choice; it is a custom of permitting or encouraging its staff to practice medicine without a license. It is a practice of customarily violating the Maryland Code of Regulations. It can thus come as no surprise that such a practice would result in tragedy; indeed, it is inevitable that it would. Therefore, Conmed and Correct Care's Motion for Summary Judgment is denied.

## IV.    CONCLUSION

PA Sidorowicz's Motion for Summary Judgment on all counts is granted. Dr. Paden and CNA Sampson's Motions for Summary Judgment on Count II are granted. The remaining Motions for Summary Judgment are denied. Defendants' Motion to Strike is denied. A separate order shall issue.

Date: <u>March 6, 2019</u>                    /s/_____
                                                      GEORGE J. HAZEL
                                                      United States District Judge